1  Jay D. Ellwanger (CA Bar No. 217747)
   **ELLWANGER LAW LLLP**
2  8310-1 N. Capital of Texas Highway, Ste. 190
3  Austin, Texas 78731
   jellwanger@equalrights.law
4  (737) 808-2260
   Attorney for Plaintiff
5

6                    **UNITED STATES DISTRICT COURT**

7                    **CENTRAL DISTRICT OF CALIFORNIA**

8

9  ASHLEY LINDSAY MORGAN                    **No. 2:21-cv-5289**
   SMITHLINE,
10
                    Plaintiff,
11
                                            **COMPLAINT**
        v.
12
   BRIAN WARNER a/k/a MARILYN
13 MANSON, individually, and MARILYN        **(JURY TRIAL DEMANDED)**
   MANSON RECORDS, INC.,
14
                    Defendants.
15

16  1.     Plaintiff ASHLEY LINDSAY MORGAN SMITHLINE; ("Ms. Smithline" or "Plaintiff"),

17  by and through her attorneys, bring this action for damages and other legal and equitable relief,

18  stating the following as Plaintiff's claims against BRIAN WARNER a/k/a MARILYN MANSON,

19  individually ("Mr. Warner"), and MARILYN MANSON RECORDS, INC., ("Marilyn Manson

20  Records" and, together with Mr. Warner, "Defendants"). Plaintiff demands a trial by jury.

21

22                                  **INTRODUCTION**

23  2.     This is an action brought by Plaintiff seeking damages from Defendants for sexual assault,

24  sexual battery, intentional infliction of emotional distress, unlawful imprisonment, violations of the

25  Bane Act, and/or violations of the Trafficking Victims Protection Reauthorization Act, and any

26  other cause(s) of action that can be inferred from the facts set forth herein.

27  3.     Mr. Warner is a recording artist based in Los Angeles, California.
28

                                            1                                **COMPLAINT**

4. Ms. Smithline is an American model and entertainer, who began modeling internationally at age 13.

5. Plaintiff alleges that she is entitled to recover general damages, special damages, and punitive damages, as well as such other and further relief as this Court finds necessary and proper.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction upon this Court for all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants maintain offices, conduct business, and reside in this District.

## PARTIES

8. Defendant BRIAN WARNER a/k/a MARILYN MANSON is an individual who lives in Los Angeles, California.

9. Defendant MARILYN MANSON RECORDS, INC. is a privately held corporation with its principal place of business located in Los Angeles, California.

10. Plaintiff ASHLEY LINDSAY MORGAN SMITHLINE is a person who has been aggrieved by Defendants' actions. She is a citizen of the United States of America and is a resident of the state of California.

## STATEMENT OF FACTS

11. In or around 1999, Marilyn Manson Records was founded by Mr. Warner. Mr. Warner served as a musician and CEO of the record label. To help oversee the record label, Mr. Warner

employed staff to facilitate both personal and professional ventures. As Mr. Warner's reputation within the entertainment industry grew, so too did the stature of Marilyn Manson Records.

12. Ms. Smithline was working as a model in Bangkok, Thailand, when she was first contacted by Mr. Warner in or around the summer of 2010. Mr. Warner contacted Ms. Smithline numerous times through various forms of social media, including Facebook and Skype.

13. During this early communication, Mr. Warner expressed a desire to cast Ms. Smithline in an upcoming film project. Between July and August 2010, Ms. Smithline and Mr. Warner talked frequently via text, e-mail, and telephone.

14. During this time, Mr. Warner developed an obsession with Ms. Smithline, telling her that she "was the perfect girl for him" and demanding that she frequently send him pictures of herself. Mr. Warner's obsessive behavior continued well into their relationship—while Ms. Smithline was having a medical procedure in April 2011, Mr. Warner continually called Ms. Smithline and Ms. Smithline's friends when she did not answer.

15. Over the course of their communication, Ms. Smithline confided to Mr. Warner that she wished to get out of modeling. Mr. Warner told her that he believed in Ms. Smithline as an actress and continued to recruit her to be cast in a film project he was allegedly planning.

16. On or around November 10, 2010, Mr. Warner flew Ms. Smithline to Los Angeles for the first time to meet and work on a film project. Ms. Smithline understood this to be a film and photo series.

17. Ms. Smithline informed her Thai modeling agency that she was visiting Los Angeles to be cast in a movie. Mr. Warner told Ms. Smithline that the film would be a remake of "True Romance" and would include director Eli Roth and actor Naveen Andrews.

18. Soon after Ms. Smithline arrived in Los Angeles in or around mid-November 2010, Mr. Warner asked her to move into his apartment. Ms. Smithline agreed.

19.     Mr. Warner's apartment served as the "studio" for the "film project." There were times when entire production crews were present, in addition to members of Mr. Warner's band such as Twiggy Ramirez ("Ramirez"). Ms. Smithline was berated by Mr. Warner when she did not wear makeup and told to wear black lingerie, her "costume," while at the studio.

20.     Several days after moving in with Mr. Warner, Ms. Smithline and Mr. Warner began a consensual sexual relationship. However, it quickly became apparent that consensual sex was not enough for Mr. Warner.

21.     In or around mid-November 2010, Ms. Smithline awoke from unconsciousness with her ankles and wrists tied together behind her back and Mr. Warner sexually penetrating her. Ms. Smithline told Mr. Warner to stop and said no multiple times, and Mr. Warner told her to "shut the fuck up" and "be quiet." Mr. Warner also squeezed Ms. Smithline's ribs, causing bruising and pain whenever she breathed that lasted for a week, as well as additional injuries to her vagina.

22.     In or around mid-November 2010 Ms. Smithline was again sexually assaulted by Mr. Warner.

23.     Mr. Warner began choking Ms. Smithline and forced her onto his bed. Mr. Warner then forcibly penetrated Ms. Smithline without her consent.  Ms. Smithline said no several times and told Mr. Warner to get off of her. In response, Mr. Warner put a pillow over Ms. Smithline's face, preventing her from breathing.

24.     Mr. Warner then grabbed a knife next to the bed and began cutting Ms. Smithline's shoulder, inner arm, and stomach. The cuts drew blood and caused Ms. Smithline to go into shock. To this day, Ms. Smithline bears the scars of Mr. Warner's cuts.

25.     Several days after Thanksgiving 2010, Ms. Smithline was again forced to have sex with Mr. Warner. Mr. Warner attempted to tie up Ms. Smithline and she resisted. As Ms. Smithline

resisted, Mr. Warner attempted to physically restrain her, resulting in Mr. Warner elbowing Ms. Smithline in the nose.

26. Mr. Warner then stopped trying to tie up Ms. Smithline. Instead, Mr. Warner held down Ms. Smithline by her shoulders and arms and forcibly penetrated her. Ms. Smithline told Mr. Warner to stop several times and feared for her life.

27. Soon after, Ms. Smithline flew to Thailand for a modeling job. Ms. Smithline first stopped into a hospital to receive medical treatment. She was diagnosed with a hairline fracture of her nose.

28. Between mid-November 2010 and January 2013, Ms. Smithline visited Mr. Warner several times, flying back and forth to Los Angeles from modeling jobs in Asia. Ms. Smithline continued visiting Mr. Warner due to the severe mental duress caused by Mr. Warner's abuse. Ms. Smithline endured threats to her life while with Mr. Warner and suffered threats to her life when Mr. Warner felt she would leave him. Mr. Warner manipulated Ms. Smithline into a state of near-total isolation, both physically and emotionally. Once isolated, Mr. Warner exercised complete control over Ms. Smithline; her continued involvement in the relationship was borne out of this severe mental duress.

29. Over the course of this relationship, Ms. Smithline was forced to do various jobs for Mr. Warner, such as serving as his personal chef.

30. Mr. Warner kept his apartment in near-total darkness, preventing Ms. Smithline from knowing the time of day. Mr. Warner's apartment was so dark and so cold that Ms. Smithline described it as a "black refrigerator."

31. Mr. Warner would lie about the time of day, forcing Ms. Smithline to work at all hours and kept her awake by giving her cocaine or blaring loud music. Mr. Warner also did not

provide Ms. Smithline food to eat. Between the sleep deprivation, drug use, and malnourishment, Ms. Smithline's weight dropped to approximately 80 pounds.

32. In addition, Mr. Warner repeatedly threatened Ms. Smithline's life, telling her that he would "find her" and "kill her if she left him." Other times, Mr. Warner would casually tell Ms. Smithline that he "could kill her right now."

33. Mr. Warner also abused Ms. Smithline whenever he felt "disrespected" by her. On one occasion, Ms. Smithline excused herself to use the bathroom while one of Mr. Warner's songs was playing. Mr. Warner took offense and when Ms. Smithline returned, he grabbed her by the wrist and told her to "be respectful." Mr. Warner also kept a soundproof glass enclosure in his bedroom that was known as "the bad girls' room." Ms. Smithline was repeatedly locked in that enclosure.

34. Mr. Warner also demeaned Ms. Smithline in front of others. In one instance after Thanksgiving 2010, Mr. Warner and Ms. Smithline were spending time with a group of friends and bandmates. Mr. Warner commented to everyone that Ms. Smithline had the best breasts and proceeded to tell Ms. Smithline to show everyone her breasts. At this point, Ms. Smithline felt like she could not say no—Mr. Warner's control over Ms. Smithline was complete and total.

35. Ms. Smithline was also subjected to physical abuse by Mr. Warner. On one occasion, Mr. Warner grabbed Ms. Smithline's chin. Mr. Warner frequently bit Ms. Smithline, leaving marks and bruising that would last for weeks. The abuse escalated into Mr. Warner shaking Ms. Smithline and strangling her by putting his hand in her mouth. On yet another occasion, Mr. Warner threw a Nazi knife at Ms. Smithline, only barely missing her face. Mr. Warner also burned Ms. Smithline.

36. At multiple times during their relationship, Mr. Warner whipped Ms. Smithline. On the first occasion, Mr. Warner whipped Ms. Smithline's bare back 15-20 times while she laid in

bed. In addition, Mr. Warner took photographs of the scarring from the whip and posted them on in internet without Ms. Smithline's consent. Ms. Smithline was whipped again, and each subsequent whipping increased in intensity and left scars that lasted for months.

37. Mr. Warner also took photographs of Ms. Smithline that were sexual in nature. When Ms. Smithline asked for these photographs, Mr. Warner refused to give them to her and would not disclose if he had deleted them. Mr. Warner instead used the photographs as leverage, telling Ms. Smithline that he would "ruin [her] in a heartbeat" with all the photos he had of her and that "[her] career would end."

38. Ms. Smithline was also subject to "branding" by Mr. Warner. On one occasion, Mr. Warner carved his stage name initials into Ms. Smithline's thigh, leaving the letters "MM" visible to this day.

39. Mr. Warner told Ms. Smithline that he only dated Jewish girls. While Ms. Smithline was away modeling in Asia, Mr. Warner requested that she purchase and bring back Nazi paraphernalia. Ms. Smithline, who is Jewish, did as much, bringing Mr. Warner rings, throwing stars, a mask, and a knife—all adorned with swastikas. Mr. Warner knew Ms. Smithline was Jewish and played this traumatizing behavior off as a joke between the two of them. Nonetheless, Mr. Warner demanded that Ms. Smithline purchase as much Nazi memorabilia that she could find. Mr. Warner would refer to Ms. Smithline as a "dirty Jew" and a "kike" when he was angry with her.

40. Mr. Warner's abusive behavior isolated Ms. Smithline from her friends and family. During Thanksgiving 2010, when Ms. Smithline visited Mr. Warner, Mr. Warner demanded Ms. Smithline not tell anyone, including her friends and family, that she was visiting him. Not long after Thanksgiving 2010, Mr. Warner confiscated Ms. Smithline's phone, preventing her from contacting anyone.

41. At no point before, during, or after their relationship did Ms. Smithline tell Mr. Warner she had a sexual "kink" or "fantasy" for this sort of behavior. Mr. Warner never told Ms. Smithline that he had those "kinks" or "fantasies" either—he just abused her.

42. Ms. Smithline felt like she was constantly having to prove herself to Mr. Warner. Through his physical, emotional, and verbal abuse, Mr. Warner exercised total control over Ms. Smithline, to the point that Ms. Smithline became powerless and brainwashed by Mr. Warner.

43. To this day, Ms. Smithline deals with complex Post-Traumatic Stress Disorder, anxiety, Obsessive Compulsive Disorder, and panic attacks as a result. The scars left from Mr. Warner's knife cuts are a daily reminder of the torment Ms. Smithline endured and survived.

44. It took Ms. Smithline years to understand the extent of Mr. Warner's physical, sexual, psychological, and emotional abuse. In fact, the true extent of the injuries suffered by Ms. Smithline were not fully realized until Fall 2020, when she began meeting with other survivors of Mr. Warner's abuse. Ms. Smithline still fears the reach of Mr. Warner. Given his stature in the entertainment industry, the threat posed by Mr. Warner is not limited to Mr. Warner the individual. Rather, the threat is diffuse and shared among Mr. Warner's legion of fans, supporters, and colleagues. As a result, Ms. Smithline has been forced to live in a constant state of fear.

45. The meetings with other survivors exposed the malevolent extent of Mr. Warner's exploitative and abusive behavior. The survivors with whom Ms. Smithline spoke revealed their own emotional, physical, verbal, and sexual abuse by Mr. Warner. Like Ms. Smithline, many of the survivors suffer lingering effects of the abuse, including post-traumatic stress disorder.

46. These meetings were also the first confirmation that Ms. Smithline was not alone and the trauma she suffered was part of a pattern of horrific behavior by Mr. Warner. The constant verbal, emotional, and physical abuse created a hostile environment for Ms. Smithline.

47. When she met with the support group in Fall 2020, Ms. Smithline finally found a semblance of refuge. Ms. Smithline found in this group a network of survivors who helped her fully understand the trauma she endured. The network of supporters revealed something novel: the full extent of the unlawful acts suffered by Ms. Smithline.

48. Because Ms. Smithline recognized the unlawfulness of Mr. Warner's actions and the extent of her injuries after these meetings with survivors in Fall 2020, the statute of limitations period for her causes of action were tolled and are timely.

### *Trafficking Victims Protection Act*

49. Mr. Warner employed fraud to bring Ms. Smithline to the United States from Thailand. He encouraged Ms. Smithline to transition to acting from a career in modeling by promising work opportunities that never materialized.

50. Ms. Smithline reasonably relied upon Mr. Warner's promises of work due to his connections, power, and stature in the industry. Mr. Warner is a well-known figure in the entertainment industry and has been for over two decades. Mr. Warner used both fraudulent offers of film and photo series roles to convince Ms. Smithline to travel to Los Angeles, whereupon Mr. Warner then verbally, physically, and emotionally abused Ms. Smithline and performed violent sexual acts on Ms. Smithline to which she did not consent.

51. Because Mr. Warner had cast Ms. Smithline in what she believed to be a legitimate film and photo series, and in conjunction with Mr. Warner's connections in the industry, her reliance on future projects was reliable. In fact, Mr. Warner went so far as to encourage Ms. Smithline's desire to get out of modeling for a career as an actress.

52. Mr. Warner knew these offers to be fraudulent. No effort was made to complete production of the film project and to date nothing from that project has been published. Mr. Warner merely used the film project as a pretense to lure Ms. Smithline to the United States. No effort was

made to complete the film project, providing further evidence that the project was a mere fraudulent pretense used to bring Ms. Smithline to Los Angeles. After Mr. Warner cultivated Ms. Smithline's dependency on Mr. Warner, he sought complete control over Ms. Smithline to do his bidding. Mr. Warner's culpability is further demonstrated by preventing Ms. Smithline from escaping the situation by confining her to the glass enclosure in his bedroom, threatening her life if she attempted to leave him, and restricting her communications.

53. Ms. Smithline provided not only "commercial sex" as legally defined, but also a variety of unpaid labor for Mr. Warner between November 2010 and January 2013. This included serving and preparing food for Mr. Warner and his guests and being forced to show his friends and bandmates her naked breasts. Mr. Warner implied that because he had brought Ms. Smithline to the United States and provided housing and a transition from modeling to acting, she owed him labor and sexual intimacy. Ms. Smithline feared for her safety and that of her friends and family if she did not comply.

54. Marilyn Manson Records is complicit in Mr. Warner's unlawful actions. As Marilyn Manson Records had a vested financial interest in the success of Mr. Warner, it had every incentive to encourage Mr. Warner's violent tendencies. Indeed, Marilyn Manson Records helped foster Mr. Warner's abusive behavior for the furtherance of its own commercial success. This extends to the purported "film project" Mr. Warner used to lure Ms. Smithline to the United States; Mr. Warner's entertainment success equated to the success of Marilyn Manson Records. Staff members of Mr. Warner's label and band members hung around the "set" of this "film project" and watched the abuses firsthand. Given the stature of Mr. Warner and Marilyn Manson Records, Ms. Smithline had every reason to believe she would be afforded new entertainment opportunities with Mr. Warner and Marilyn Manson Records. In sum, Mr. Warner used his status as CEO and musician of Marilyn Manson Records to induce Ms. Smithline to come to the United States from overseas. Thus, the

forced labor obtained by Mr. Warner's fraudulent promises to Ms. Smithline benefitted not just Mr. Warner, but Mr. Warner's record label Marilyn Manson Records. In sum, Mr. Warner, as CEO of Marilyn Manson Records, used his position and prominence within the company to lure Ms. Smithline to the United States, where she was then forced to provide labor and sexual services on behalf of Mr. Warner and Marilyn Manson Records.

*Sexual Assault & Sexual Battery*

55. Mr. Warner used drugs, force, and threats of force to coerce sexual acts from Ms. Smithline on multiple occasions. Mr. Warner raped Ms. Smithline several times beginning in or around November 2010. Ms. Smithline was well aware of the violence Mr. Warner could dole out if she fought back, having been on the receiving end of his temper many times. He also supplied drugs to Ms. Smithline and deprived her of sleep and food in order to weaken her physically and mentally and decrease her ability to refuse him.

56. Mr. Warner's behavior towards Ms. Smithline demonstrates a disturbing and coercive intent. Throughout the relationship, Ms. Smithline faced the constant decision of staying with Mr. Warner and enduring his abuse or leaving and endangering her life. In addition, Ms. Smithline lived in a constant fear of making Mr. Warner angry, which she knew would only escalate the danger she was already in. Mr. Warner supplied alcohol and drugs to Ms. Smithline, as well as deprived her of sleep, all to more solidify his control over her and diminish her ability to refuse him.

57. Mr. Warner committed sexual acts with Ms. Smithline when she was unconscious or otherwise unable to consent.

58. Mr. Warner also committed sexual battery against Ms. Smithline on multiple occasions throughout her time in Los Angeles between November 2010 and January 2013. These acts included cutting Ms. Smithline's shoulder, arms, chest, and legs, whipping Ms. Smithline's

bare back, smothering Ms. Smithline during a sexual assault, and choking, strangling, biting, and burning her for Mr. Warner's sexual gratification—all without the consent of Plaintiff.

### *The Bane Act*

59. Mr. Warner interfered with Ms. Smithline's civil rights regarding her religion and her right to be free from sexual discrimination and harassment.

60. Ms. Smithline's duties for Mr. Warner included serving as a personal chef and working on his film project. Throughout this relationship, Mr. Warner regularly verbally and physically demeaned Ms. Smithline, both in private and in front of others.

61. Mr. Warner asked Ms. Smithline, who is Jewish, to purchase Nazi paraphernalia for him while she worked in Asia. Mr. Warner chalked this twisted request up to an inside "joke" between the two of them. Mr. Warner coerced this demeaning and religiously motivated behavior through his abuse.

62. Mr. Warner also abused Ms. Smithline by using the Nazi paraphernalia to scar her. A knife emblazoned with a swastika was used to cut Ms. Smithline while she was raped. This was targeted behavior; Mr. Warner told Ms. Smithline that "he only dated Jewish girls." He also would call Ms. Smithline a "dirty Jew" and a "kike" when he was angry with her. Thus, his actions against her, including use of the Nazi paraphernalia, were motivated by Ms. Smithline's religious identification.

63. Further, Mr. Warner regularly subjected Ms. Smithline to abuse as she worked for him as a personal chef. This includes having Ms. Smithline wear outfits that pleased Mr. Warner (such as a black, topless corset and other lingerie), making Ms. Smithline reveal her bare breasts to Mr. Warner's friends, and raping and sexually assaulting Ms. Smithline while she was in his apartment. These actions were motivated directly by Ms. Smithline's sex.

### *Intentional Infliction of Emotional Distress*

64. Ms. Smithline also suffered extreme emotional harm from Mr. Warner. Mr. Warner tied up Ms. Smithline while she was unconscious and raped her, forced her to engage in non-consensual oral and vaginal sex, and made multiple threats against her life. Mr. Warner also non-consensually cut Ms. Smithline during a sexual assault. This was intentional conduct motivated by Mr. Warner's sexual desires.

65. In addition, Ms. Smithline was forced to watch clips of movie scenes depicting gruesome suicides and child pornography. This was so intense it left Ms. Smithline wondering if Mr. Warner wanted her to kill herself. Again, this was intentional conduct motivated by Mr. Warner's sexual desires.

66. The deterioration of Ms. Smithline's health also led to her emotional distress. This was intentionally done by keeping Ms. Smithline sleep-deprived, supplying her with drugs, and not providing her food to eat.

67. The emotional abuse caused by isolation of friends and family as well as the brainwashing that occurred by Mr. Warner has caused Ms. Smithline to suffer intense emotional distress. To this day, Ms. Smithline suffers a litany of lingering effects borne out of Mr. Warner's abuse, including Post-Traumatic Stress Disorder, obsessive Compulsive Disorder, paranoia, and anxiety.

### *Unlawful Imprisonment*

68. Ms. Smithline was placed against her will in the glass enclosure in Mr. Warner's room multiple times. Further, while Ms. Smithline stayed with Mr. Warner, she was not permitted to leave and her contact with the outside world diminished when Mr. Warner confiscated her cell phone. Ms. Smithline was also regularly berated and physically abused if she left the room while

Mr. Warner's music was playing and Ms. Smithline's life was often threatened if she left Mr. Warner. This fostered a sense of emotional, non-physical restraint.

69. Ms. Smithline was also regularly tied up by Mr. Warner, often during rapes or attempted rapes by Mr. Warner.

70. Mr. Warner expressly intended such confinement. Mr. Warner confiscated Ms. Smithline's cell phone. Mr. Warner bound Ms. Smithline with rope. Mr. Warner locked Ms. Smithline in the glass enclosure. All of this served to manipulate and further control Ms. Smithline, forcing her to become totally reliant on Mr. Warner. This was also done for Mr. Warner's sexual pleasure.

71. Mr. Warner had neither consent, nor authority to prevent Ms. Smithline from leaving the apartment.

## CAUSES OF ACTION

### *AS AND FOR A FIRST CAUSE OF ACTION FOR SEXUAL ASSAULT, CA. CODE CIV. PRO. § 340.16, AGAINST DEFENDANT WARNER*

72. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

73. Defendant Warner committed a sexual assault of Plaintiff as more fully described in Section 243.4, 261, 262, 264.1, 286, 287, or 289, or former Section 288a, of the California Penal Code, and/or assault with the intent to commit any of those crimes, and/or or an attempt to commit any of those crimes.

74. Plaintiff's requests for relief are set forth below.

### *AS AND FOR A SECOND CAUSE OF ACTION FOR SEXUAL BATTERY, CA. CODE. CIV. PRO. § 1708.5, AGAINST DEFENDANT WARNER*

75. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

76. Defendant Warner acted with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff, and a sexually offensive contact with Plaintiff directly or indirectly resulted.

77. Defendant Warner also acted with the intent to cause a harmful or offensive contact with Plaintiff by use of his intimate part, and a sexually offensive contact with that person directly or indirectly resulted.

78. Defendant Warner also acted to cause an imminent apprehension of the conduct described above, and a sexually offensive contact with Plaintiff directly or indirectly resulted.

79. Plaintiff's requests for relief are set forth below.

### *AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF THE TRAFFICKING VICTIM'S PROTECTION REAUTHORIZATION ACT ("TVPRA"), 18 U.S.C.S. § 1589, AGAINST DEFENDANTS WARNER AND MARILYN MANSON RECORDS*

80. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

81. Defendant Warner knowingly obtained the labor or services of Plaintiff by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; by means of serious harm or threats of serious harm to Plaintiff or another person; by means of the abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, she or another person would suffer serious harm or physical restraint.

82. Defendant Marilyn Manson Records knowingly benefited financially and/or by receiving value from forced labor by means described above and herein. Defendant Marilyn Manson Records participated in this venture knowing, or in reckless disregard of the fact that the venture engaged in obtaining labor or services by the means described above or herein.

### *AS AND FOR A FOURTH CAUSE OF ACTION FOR INTERFERENCE WITH THE EXERCISE OF CIVIL RIGHTS IN VIOLATION OF THE BANE ACT, CA. CODE. CIV. PRO. § 52.1, AGAINST DEFENDANT WARNER*

83. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

84. California Civil Code section 52.1, also known as the Bane Act, prohibits any person or persons from interfering with the exercise or enjoyment of rights under the Constitution and laws of this state and the United States by use or attempted use of threats, intimidation, or coercion.

85. Defendant Warner used or attempted to use threats, intimidation, or coercion to interfere with the civil rights of Plaintiff, including but not limited to her rights to be free from religious persecution and from sexual discrimination and harassment. Defendant Warner engaged in the conduct described herein because of Plaintiff's sex and religion. Defendant Warner intimidated and coerced Ms. Smithline by engaging in conduct described herein.

86. Because of Defendant Warner's experience and stature in the entertainment industry, which Plaintiff sought to join, Plaintiff felt pressured to acquiesce to Defendant Warner's demands.

87. By the conduct described herein, Defendant Warner intended to deprive Plaintiff of enjoyment or exercise of her civil rights.

88. As a result of Defendant Warner's actions, Plaintiff suffered harm.

89. Plaintiff did not discover her cause of action until Fall 2020, as described herein.

90. As a result of this unlawful conduct, Plaintiff is entitled to damages in an amount to be determined at trial.

91. Defendant Warner's conduct was done with oppression, fraud, and/or malice. Plaintiff is entitled to punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,
### AGAINST DEFENDANT WARNER

92. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

93. Defendant Warner's conduct was extreme and outrageous with the intention of causing, or reckless disregard of the probability of causing emotional distress.

94. As a result of Defendant Warner's actions, Plaintiff suffered harm and severe emotional distress that she still suffers from to this day.

95. Plaintiff did not discover her cause of action until later, as described herein.

96. As a result of Defendant Warner's conduct, plaintiff is entitled to damages in an amount to be determined at trial.

97. defendant Warner's conduct was done with oppression, fraud, and/or malice. Accordingly, plaintiff is entitled to punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION FOR
### FALSE IMPRISONMENT, AGAINST DEFENDANT WARNER

98. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

99. Defendant Warner intentionally restrained, detained, and/or confined Plaintiff in his Los Angeles apartment for an appreciable amount of time.

100. Defendant Warner had no authority to retrain, detain, and/or confine Plaintiff.

101. Plaintiff did not consent to the restraint, detainment, and/or confinement by Defendant Warner.

102. As a result of Defendant Warner's actions, Plaintiff suffered harm and severe emotional distress that she still suffers from to this day.

103. Plaintiff did not discover her cause of action until later, as described herein.

104. As a result of Defendant Warner's conduct, Plaintiff is entitled to damages in an amount to be determined at trial.

105. Defendant Warner's conduct was done with oppression, fraud, and/or malice. Plaintiff is entitled to punitive damages.

106. Plaintiff's requests for relief are set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself, prays for the following relief:

A. That Plaintiff be awarded actual damages;

B. That Plaintiff be awarded compensatory damages where available;

C. That Plaintiff be awarded punitive damages;

D. That Plaintiff be awarded pre and post judgment interest;

E. That the Court award Plaintiff her attorneys' fees and costs associated with this matter, including but not limited to expert fees and costs; and

Plaintiff further demands that she be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated:      June 29, 2021            /s/ *Jay D. Ellwanger*

Jay D. Ellwanger
California Bar No. 217747
**ELLWANGER LAW LLLP**
8310-1 N. Capital of Texas Highway
Suite 190
Austin, Texas 78731
jellwanger@equalrights.law
(737) 808-2260
(737) 808-2262 (facsimile)
Attorney for Plaintiff